ROBERT A. WATSON, Respondent, *v.* WILLIAM GILLESPIE and Others, Copartners Doing Business under the Firm Name and Style of GILLESPIE BROS. & Co., Appellants.

First Department, June 1, 1923.

Contracts — action to recover amount due on alleged account stated — under contract of employment plaintiff was to receive one-third of net profits — business was conducted on credit basis — at close of each year " account current " was rendered plaintiff which did not show any debits or credits for preceding year except withdrawals by plaintiff from amount found due to him year before — prior to March fifteenth each year profit and loss statement was made showing actual profits and also book profits for preceding year, taking into consideration losses on prior credits — plaintiff's services ended January 21, 1920 — demand was made for amount due on " account current " before profit and loss statement was made — plaintiff is entitled to recover on basis of actual net profits only — " account current " is not account stated.

In an action to recover the amount due on an alleged account stated, it appeared that the plaintiff was employed by the defendants under a contract whereby he was to receive a percentage of the net income of the business; that in con-

ducting the business long terms were extended to customers; that at the close of each year an " account current " was rendered to the plaintiff which did not include any debits or credits for the preceding year, with the exception of withdrawals made by the plaintiff from the amount found due to him the year before; that prior to March fifteenth of each year a profit and loss statement was made which showed the actual profits for the preceding year and the book profits on credit business and included deductions for losses on bad accounts for years preceding the year covered by the profit and loss statement and showed the actual amount then due the plaintiff on the business for the preceding year; that the plaintiff severed his connection with the defendants on January 1, 1920, and received from the defendants an " account current " for the preceding year; that prior to the time a profit and loss statement was made for the year 1919, plaintiff demanded payment of the tentative amount shown due by the " account current;" that the profit and loss statement for the year 1919 reduced the actual net profits due to the plaintiff by over $37,000; that during the term of plaintiff's employment settlement had always been made on the basis of actual net profits, book profits being used only until actual profits could be ascertained and at no time during his employment was he ever paid his share of the profits on the basis of book profits.

*Held,* that the defendants were under no obligation to pay the plaintiff any sum whatever, except actual profits on the liquidation of accounts;

That the " account current " was not an account stated nor was it given to the plaintiff or received by him as such, but was a tentative statement subject to later adjustment and subject to change for errors or omissions and was, as stated on the account, an " account current " merely, and, therefore, the implied finding of the jury that the action was based upon an account stated should be reversed.

APPEAL by the defendants, William Gillespie and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 8th day of June, 1922, upon the verdict of a jury, and also from an order entered in said clerk's office on the 15th day of June, 1922, denying defendants' motion for a new trial made upon the minutes.

*Satterlee, Canfield & Stone* [*Harlan F. Stone* of counsel; *R. Randolph Hicks* and *Daniel R. Brenton* with him on the brief], for the appellants.

*White & Case* [*David Paine* of counsel], for the respondent.

DOWLING, J.:

This action was brought on an alleged account stated. At the close of plaintiff's case a motion was made to dismiss the complaint on the ground that plaintiff's proof did not show an account stated, which was denied. This motion was renewed at the close of the whole case and again denied. Upon the rendition of the verdict a motion was made to set aside the verdict and for a new trial on the ground that the verdict was contrary to the law and the evidence, which was denied. To all of these denials exception was duly taken.

The question presented on this appeal is succinctly stated by the learned counsel for appellants, as follows: "Whether a 'current account' so intended and so labeled, rendered as a basis of subsequent liquidation by an employee employed by these defendants, can or has in this case by acceptance by the plaintiff to whom it was rendered become an account stated so as to entitle this plaintiff to the credit balance shown in cash, when such effect is contrary to and in derogation of the express terms of a written contract existing between the plaintiff and defendants, and when it has the further effect of crediting plaintiff, who is entitled under the contract only to net profits, with book profits which to the knowledge of both plaintiff and defendants had been turned into losses by shrinkage in the inventory value of accounts receivable on the basis of which the profits had been computed."

The essential facts in the case are undisputed. Defendants are British citizens, composing a firm engaged in exporting and importing, with a London house, and maintaining a branch office in New York city. Prior to 1907 defendant Gillespie was the manager of the latter, but when plaintiff entered defendants' employ, as hereinafter recited, Gillespie returned to London as head of the firm and left plaintiff in charge here as manager.

On the 30th day of November, 1907, the plaintiff and the defendants entered into a written contract wherein the plaintiff was employed by the defendants for a period of thirteen months. The defendants agreed to pay the plaintiff for his services "the sum of Four hundred ($400) Dollars per month and, in addition, [he] shall receive a sum equal to one-third ($\frac{1}{3}$) of the net profits derived from any new business (as hereinafter defined), obtained by him for the parties of the first part during the course of his employment. Said profits are to be paid to the party of the second part at the end of his period of employment, or as soon thereafter as all accounts to which they relate are liquidated, but it is understood that in computing the profits, any losses on any of the said accounts are to be deducted."

This contract, with slight changes hereinafter set out, was extended from time to time by brief informal agreements. In the extension agreement of November 12, 1914, which was by letter, the plaintiff's commissions were increased from one-third of the net profits of the new business to one-sixth of the net profits of all the New York business, in the following language: "As the result of our conversation as to extension of your engagement with us, which expires on the 31st December next it is agreed that we continue to employ you for a period of one year from 1st January, 1915, as per the terms of our contract dated 30th Novem-

ber, 1907, except that clauses 3 and 4 are rescinded and instead you will continue to be paid for your services the sum of $400.00 per month and in addition receive a sum equal to one-sixth ($\frac{1}{6}$) of the net profits derived from the whole of our business transacted in this office instead of on new business only as therein provided."

Under the extension agreement, also by letter, of January 10, 1917, the period of employment was automatically extended from month to month subject to termination by either party on one month's notice. A provision was further made wherein the net profits were to be divided *pro rata* if the plaintiff should leave the employment of the defendants before the end of any fiscal year. This extension agreement reads as follows: "Referring to our conversation in regard to your engagement with us and which expired on the 31st ulto you will understand that under present conditions we cannot renew same for another year as usual so we confirm the understanding arrived at between us viz — that we continue to employ you on a monthly basis commencing on the 1st inst. which can be terminated by one month's notice on either side. Your remuneration for your services to remain as during the past year viz. $400.00 per month, paid monthly and a bonus of one-sixth of the net profits of our New York business. These profits to be calculated as in the past and credited to your account when ascertained. As regards this bonus it is understood that should our relations cease before the end of this year or future one your share will be calculated *pro rata* for the number of months out of the year you are with us as compared to the total profits for the whole year as we can only fairly ascertain them at the end of each year and pay your share on that basis. Of course, it is understood that this arrangement, as heretofore, does not in any way constitute a partnership between us."

This agreement was automatically renewed from month to month up to the first of the year 1920, at which time the plaintiff and the defendants mutually terminated the contract of employment.

The business of the New York office of defendants was very largely an export and import business with concerns located in South America. In transacting business with these houses, credits carrying interest were often extended for long periods of time.

In order to meet the requirements and to comply with the regulations of the tax authorities, and also to keep the plaintiff and the defendants informed as nearly as possible as to the condition of the business, the following system of keeping the books of accounts was adopted: At the time the sales were made and the invoices written up, a paper profit was entered upon the books of the firm. At the end of each year, between the thirty-first

of December and the fifteenth day of March, Mr. Griffin (one of the firm), Mr. Clements (in charge of its finanical department) and Mr. Watson (the plaintiff) went over all the outstanding accounts originating from sales made in all previous years, and made up a list of bad debts. This was a tentative list, including accounts which appeared to them bad at that time. Some of the bad debts placed on this list originated from credit sales made during the year just ended, some from credit sales made two or more years before, etc.; so that the bad-debt list, which was made up between the 31st day of December, 1919, and the 15th day of March, 1920, as was the usual custom and practice of the business, included bad debts for the year 1919 and previous years back as far as the year 1916.

At the end of each year, also between the thirty-first of December and the fifteenth of March, a profit and loss statement was made up for the fiscal year last ending, which included actual realized profits for the year and also paper profits on outstanding sales and unliquidated claims for the year not included in the bad debt list. This statement also included interest on outstanding sales and profits, if any, realized from the liquidation of outstanding sales, which had theretofore been marked off as bad debts. It was a tentative statement, subject to later adjustment, and losses which thereafter invariably occurred on outstanding unliquidated sales, which, however, were by necessity and pursuant to tax requirements carried as paper profits, were from year to year, pursuant to the custom and agreement of the parties, charged up, together with interest, against the plaintiff and the partners, and deducted from the profits of the following years. The profit and loss statement, taken from the books and reflecting paper profits, or a credit memorandum thereof, was rendered to the plaintiff the latter part of March in each year, crediting him with his percentage of such profits as were evidenced therein at that time. His percentage was also credited to him on the books of the firm, against which he was permitted to draw for his personal needs, although a substantial sum was always left on deposit with the firm to his credit, to offset losses on outstanding sales.

Each year a personal "account current," as of December thirty-first, was made up by the bookkeeper and, under Mr. Clements' directions, rendered to the plaintiff. It was labeled an "account current," because it was not a settled account; it did not include any debits or credits resulting from the business of the year just ending; it was really a year behind, except for withdrawals which plaintiff had made during the year from the credit balance of book profits existing in his favor at the end of the preceding year;

it was an account which furnished a basis for liquidation, and it, together with the profit and loss statement for the current year which came along about March fifteenth, indicated to plaintiff exactly where he stood financially with the firm, except, of course, for the uncertainty of outstanding unliquidated accounts, some of which were certain to result in losses.

To be specific, this yearly " account current," rendered as of December 31, 1918, for example, would and did set out (1) the credit balance of plaintiff shown by the account current rendered as of December 31, 1917; (2) plaintiff's one-sixth share of the profits, part actual and part book profits, shown on the profit and loss statement of March 15, 1918, rendered for the year 1917, which took into account outstanding sales for 1917 and previous years which proved bad and were marked off during 1917; (3) interest at the rate of six per cent on daily credit balances. The plaintiff was credited with interest on his share of book profits for the obvious and just reason that the business was largely a credit business, and all book accounts carried six per cent interest until date of payment. As interest paid by defendants was a business expense shared in by plaintiff, he was credited with his share of interest receipts. The " account current " also set out (4) all withdrawals made by plaintiff during the year 1918. The net result of this account current as of December 31, 1918, was a credit balance which entirely omitted 1918 business and bad accounts from prior years marked off in 1918, and which reflected as profits all book profits not marked off a full year prior thereto. The only thing which was up to date was cash withdrawals.

As the record shows, the net result of the account current rendered as of December 31, 1918, was a credit balance in favor of the plaintiff of $37,178.98, made up of actual and paper profits. When the usual profit and loss statement was made up for the year 1918, and a credit memorandum thereof rendered to the plaintiff, it set out plaintiff's share of the actual and book profits for 1918 as $25,500.15.

It is worthy of note that these amounts were not all withdrawn by the plaintiff, as appears from the facts proved with reference to the following year.

According to the usual custom followed for eleven years prior thereto, on or about the 31st of December, 1919, the defendants' bookkeeper, by direction of Mr. Clements, made up the plaintiff's usual personal account current for the year 1919. This showed the aforesaid credit balance of $37,178.98, which appeared on the account current of December 31, 1918. It also showed the further credit of $25,500.15, the sum which was set to plaintiff's credit on

the profit and loss statement of March 15, 1919, as the result of the 1918 business. This made a sum of $62,679.13, together with interest on daily balances to plaintiff's credit. After debiting the plaintiff in detail with withdrawals made during 1919, the account current for 1919 showed a balance on defendants' books, based on actual and paper profits, omitting, however, 1919 business and accounts from former years which proved bad and were marked off in 1919, of $49,143.08. The account closed with the entry " To balance due G. B. & Co. $49,143.08," which was an error, the balance being due plaintiff. This indicates a total withdrawal by plaintiff during the entire year of 1919, omitting interest, of approximately $13,500. This is interesting and important as showing a variance from custom when plaintiff, almost immediately upon receipt of the current account for 1919, demanded payment of the entire credit balance.

This " account current " for 1919, which was the usual and ordinary account rendered at the end of each fiscal year, was signed and forwarded to the plaintiff by Mr. Clements, who was in charge of the financial department of the defendants' business under the plaintiff's supervision, on or about February 4, 1920, together with the following letter: " NEW YORK, *Feb.* 4, 1920.

" R. A. WATSON, Esq.,
    " Messrs. Huth, Gillespie & Co., Inc.,
        " 135 Front Street, New York City:

" DEAR SIR.— As usual at this season of the year we beg to wait upon you with statement of your account made up to the 31st December, showing a balance in your favor brought down on the 1st inst. of $49,143.08, which we trust you will find correct upon examination and to which we await your conformity in due course.

" We remain, Dear Sir,
                " Yours faithfully,
" Enclosures                    GILLESPIE B. CO.
        " 1                            J. P. CLEMENTS."

This statement, rendered " as usual," as the letter states, is headed:

" Mr. ROBERT A. WATSON, New York, in account current with Gillespie Bros. & Co., New York.

" Interest at 6% to 31st December, 1919."

At the end of the account were the letters " E. & O. E.," meaning errors and omissions excepted.

This " account current," so labeled and so intended, because accounts were unsettled, as they always were at this season of

the year, to the knowledge of all the parties, is the alleged account stated upon which this action is predicated.

At the time and to the knowledge of this plaintiff and the defendants and their bookkeeper and Mr. Clements, the 1919 business had resulted in losses, so that there were no profits. Plaintiff, who was manager of this business, may be assumed to have been more or less familiar with the conditions of business in 1919. It is also fair to assume that unliquidated accounts for the years 1916, 1917 and 1918, which had been carried as book profits, but which resulted in 1919 in actual losses to the extent of $221,354.22, were not unknown to him. At any rate, it appears from the record that the plaintiff did not wait patiently, as theretofore, for the profit and loss statement or credit memorandum which " as usual at this season of the year " he received on or about March fifteenth; but he promptly, by letter of Saturday, February fourteenth, ten days after the date of the letter transmitting the account which was stated on its face to be only an " account current," demanded payment of the $49,143.08. This letter does not appear in the record, but is referred to in plaintiff's letter of February 18, 1920, written four days later, in which plaintiff stated: " I am today instructing my attorney to collect same." The record also shows that the plaintiff took up the matter of payment with Mr. Griffin in person, whether before or after February eighteenth does not appear, and was told that he would be paid whatever proved to be his due when the accounts were liquidated.

The defendants proceeded as usual, and, during the latter part of February and the first part of March, 1920, the current losses on outstanding accounts found to be bad were written off the books and listed. These aggregated the sum of $355,465.90, which entirely wiped out profits for 1919, and reduced book profits on outstanding accounts for the years of 1916, 1917 and 1918 by the sum of $221,354.22.

It is not the contention of these defendants that the plaintiff was a partner or that he should share the net losses resulting from current 1919 business, which, after wiping out all possible profits, amounted to approximately $134,000. This represents a loss which defendants must suffer by themselves. They do, however, contend that this plaintiff, who under the agreement is to share only in net profits, which cannot be determined until outstanding accounts are liquidated (and the agreement between the parties so provides), is not entitled to a cash payment on account of unliquidated book profits for 1916, 1917 and 1918, which in 1919 on liquidation resulted in a loss to these defendants of $221,354.22.

Under the agreement, after taking into account certain interest and other adjustments, one-sixth of the loss, or $36,877.41, was chargeable against the credit balance of plaintiff, as reflected in the " account current " rendered as of December 31, 1919.

This " account current " showed on the basis of unliquidated book profits, omitting entirely the year 1919, a credit balance of $49,143.08. The defendants contend that from this balance should be deducted the sum of $36,877.41, the proportion of the losses chargeable to plaintiff, suffered during 1919 upon the liquidation of 1916, 1917 and 1918 accounts. This leaves a balance of $12,265.67, which amount was paid to the plaintiff by the defendants under the stipulation of June 7, 1920, thereby settling the account with plaintiff in full. This stipulation was received in evidence, but was excluded from the jury's consideration by the agreement of the parties and by the court's charge.

It will be noted, in the first place, that what the plaintiff was entitled to share in were the " net profits " earned by defendants in their business, and not merely " book profits " based on outstanding and unliquidated sales. Originally plaintiff was entitled to one-third of the net profits derived from new business. Thereafter he became entitled to one-sixth of the net profits derived from all business transacted from the New York office. Still later he was to receive a bonus of one-sixth of the net profits of the New York business. During all the term of his employment plaintiff was paid upon the basis of net profits, and never upon the basis of book profits, which, when liquidated, resulted in actual losses to defendants. Respondent claims that the modification of the contract of employment made in November, 1914, changed the manner of ascertaining net profits, but this was not the case in practice.

A typical example of this practice of settling accounts between the parties is shown in an exhibit offered in evidence by defendants, entitled " statement of share of profits," which was rendered to the plaintiff on the 29th day of February, 1916. During the year 1915 plaintiff's share of the net profits had been one-sixth, whereas in previous years his share of the net profits had been one-third. With reference to profits for 1915 business, plaintiff was credited provisionally with one-sixth of the book profits, but he was charged with one-third of the losses on bad accounts for the year 1914, which had been ascertained during 1915 to be bad, and were listed as such in the statement. This exhibit conclusively demonstrated that the parties themselves treated net profits as meaning profits after complete liquidation of the accounts from which the profits were to be derived. The same method of settling

the account was adopted in the statement rendered February 26, 1917, relating to the business for the year 1916.

It also appears affirmatively from the evidence that this method was practiced throughout the period of the plaintiff's employment. In making up the profit and loss statement for the year 1918 the plaintiff was charged with his percentage of losses in liquidating credit sales made in the years 1914, 1916, 1917 and 1918. Although the current accounts which were rendered to plaintiff, as usual, at the end of each year, credited him with book profits on unliquidated accounts, it appears from the record that at no time during the period of employment was he actually paid on the basis of book profits. He was only paid a percentage of the net profits, as was provided in the contract, after outstanding accounts had been liquidated and losses deducted. There is nothing in the record to indicate any practice or custom between the parties which in any way changed or modified the plain and clear meaning of the contracts that this plaintiff was to share only in net profits. The practice and custom followed by the parties to the agreements in question are perfectly consistent with the clear and ordinary meaning of the terms used, wherefore such practice and custom must be interpreted in accordance with the contract.

As there was no ambiguity in the terms of the contract, which from 1907 to 1920 provided and always provided that this plaintiff was to receive a share in " net profits," and as the practice and custom of the parties were at all times perfectly consistent and in accordance with the plain and ordinary meaning of " net profits," which under judicial decisions means actual profits realized from liquidated accounts, it must be held as a matter of law that the defendants were under no obligation to pay to the plaintiff any sum whatever except actual profits on the liquidation of accounts, which in fact amounted to $12,265.67, which amount was ascertained and paid to plaintiff before the trial of this action.

In the second place, it seems clear that the account of December 31, 1919, cannot be held to be an " account stated," which is the theory upon which plaintiff brought suit thereon. It was expressly labeled and entitled an " account current," and carried the comment " errors and omissions excepted." It was an account current according to the custom under which plaintiff had done business continuously throughout his dealings with defendants. This was the first time that plaintiff, instead of waiting for the revision of the account by later happenings, had sought to treat the account as final and conclusive.

As has been heretofore shown, the accounts rendered were at all times recognized by both parties as not final, but as subject

to adjustment and reduction as actual losses afterwards reduced the paper profits. An account current is in its very nature the antithesis of an account stated.

" An account current is an account not stated; a running account." (1 Am. & Eng. Ency. of Law [2d ed.], 435.)

It is " an open or running or unsettled account between two parties." (Black L. Dict.)

" Account current, open account, a course of business dealings still continuing between two parties, or an account not stated." (Century Dict.)

" An open or running account." (Webster's New Internat. Dict.)

" A running account, or the statement of the mercantile transactions of one person with another, drawn out in the form of debtor and creditor." (Worcester's Dict.)

" An open or running account between two or more parties." (Standard Dict.)

" What is an account current? Clearly, every one in which there has not been a balance agreed upon and struck between the parties." (*Franklin* v. *Camp*, 1 N. J. Law, 196.)

The fundamental principles of contract law apply to accounts stated. The minds of the parties must meet. The offerer cannot render a " current " unsettled account as a basis for subsequent liquidation and be bound on an account stated by the offeree accepting the current account as a closed, settled account between the parties. The minds of the contracting parties, in such a case, do not meet. There can be no contract. This principle of law is clearly expounded by the Court of Appeals in the case of *Lockwood* v. *Thorne* (18 N. Y. 285). The court said (at pp. 288, 289): " The minds of the parties must meet upon the allowance of each item or claim allowed, and upon the disallowance of each item or claim rejected. They must mutually concur upon the final adjustment, and nothing short of this in substance will fix and adjust their respective demands as an account stated. * * * And, as the minds of both parties are supposed to meet and concur, it must necessarily be competent to show how the party rendering the account understood the transaction. If the evidence should show clearly that he did not understand that there had been any final adjustment of their respective demands between them, it would be strange, indeed, if the courts should disregard the understanding of the parties themselves, and decree an adjustment between them contrary to their own understanding in the matter."

In *Newburger-Morris Co.* v. *Talcott* (219 N. Y. 505) Judge CARDOZO said (at p. 512): " But the very meaning of an account

stated is that the parties have come together and agreed upon the balance of indebtedness, *insimul computassent,* so that an action to recover the balance as upon an implied promise of payment may thenceforth be maintained (*Volkening* v. *DeGraaf,* 81 N. Y. 268, 271). In this case, the implication of a promise of payment has been rebutted. We have pointed out that the balance ultimately due was still unliquidated when the monthly statements were received."

The facts that the statement in question was upon its face an " account current," that it was subject to change for errors and omissions, and that the uniform practice of the parties during the entire course of employment demonstrates that it was neither intended nor proffered nor accepted as an account stated, lead to the conclusion that the necessarily implied finding of the jury that there was an account stated must be reversed, and that the judgment and order appealed from should be reversed and the complaint dismissed, with costs to appellants in this court and upon the trial.

CLARKE, P. J., SMITH, MERRELL and McAVOY, JJ., concur.

Judgment and order reversed and complaint dismissed, with costs to appellants in this court and upon the trial.